IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
SHERMAN DIVISION

| | | |
|---|---|---|
| EDUCATIONAL CREDIT MANAGEMENT CORPORATION and THE EDUCATION RESOURCES INSTITUTE, INC., Appellants, v. MICHAEL E.A.S. YOUNG, Appellee. | § § § § § § § § § § § | Case No. 4:06-cv-327 |

**MEMORANDUM OPINION AND ORDER OF REMAND**

This matter is before the court on the appeal of Educational Credit Management Corporation ("ECMC") and The Education Resources Institute ("TERI") (collectively "Appellants") of the bankruptcy court's order of June 27, 2006. In that order, the court granted Michael Young ("Debtor") a partial discharge of outstanding student loans held by Appellants. Because the court disagrees with the bankruptcy court's application of the *Brunner* test, the court is of the opinion that the order of the bankruptcy court should be REVERSED, and the matter should be REMANDED to the bankruptcy court.

**I. BACKGROUND**

Debtor seeks discharge of nearly $235,000 borrowed to finance his legal education. Appellants are the current holders of the loans and seek to avoid having the obligations discharged. Debtor began law school in the Fall of 1990 at Southern Methodist University ("SMU"), paying his expenses with student loans. (Appellant's Br. 4.) After the first semester, Debtor was ranked near the very bottom of his class, prompting him to forego taking classes in the Spring. (Appellee's Br. 2.) Debtor resumed his studies in the Fall of 1991 and graduated

from SMU in August of 1993. (*Id*.) Because he sat out for a semester, Debtor was not ranked with his classmates, but he estimates that he would have graduated "basically in the middle of the class." (Trial Tr. 95.)

During law school, Debtor worked for a family law firm, but his experience there did not culminate in an offer of full-time employment. (Appellant's Br. 4.) During his final year of law school, Debtor submitted numerous applications in search of a permanent job. Debtor then applied to, and was accepted for, the LL.M. program at Georgetown University. The associated expenses were also financed with student loans. (Appellee's Br. 2.) Debtor believed that the program would enhance his prospects for employment. While at Georgetown, Debtor clerked for a law firm, but a full-time offer did not ensue. (Appellant's Br. 4.) In May of 1994, Debtor became a member of the Pennsylvania bar. (*Id*. at 5.) Just before his loans became due, Debtor consolidated the loans that he could and sought forbearances and alternate repayment options on the others. Mem. Op. 5. Debtor found a job in January of 1995 as an attorney with Cerullo, Datte, and Wallbillich, a law firm in Pottsville, Pennsylvania. *Id*. At Cerullo, Debtor performed transactional work for a local mineral exploration company, the business generated by which constituted the vast majority of the firm's work. *Id*.

In 1995, Debtor began to repay his student loans. He continued to make payments on the loans until the Spring of 1997 when he was terminated from the law firm for disputing a questionable fee-splitting arrangement between the firm and a non-lawyer. *Id*. Debtor thereafter unsuccessfully attempted to start a solo practice. Debtor got married and had a child in 1995. In July of 1998, Debtor filed for divorce from his wife. *Id*. The proceedings proved to be costly, time-consuming and bitter. *Id*. Debtor's devotion of a substantial amount of resources to the

divorce proceeding contributed further to his unsuccessful law practice.  In 2000, Debtor moved back to Dallas.  Debtor's now-twelve year-old child has lived exclusively with Debtor since 2003.  (Trial Tr. 69.)

Upon his return to Texas, Debtor diligently sought work in the Dallas area.  (*Id*. at 60-61.)  After doing some temporary work as a result of his searches, Debtor accepted a temporary position with LexisNexis ("Lexis") in July of 2001 at a starting salary of $30,000 per year.  Mem. Op. 6.  Debtor was hired to work on a project indexing cases in Lexis' database to facilitate more effective searching.  Though the engagement was temporary, Debtor was still employed with Lexis when this appeal was filed in August of 2006.  The project and Debtor's employment were scheduled to conclude in the first quarter of 2007.  *Id*. at 7.  Debtor writes summaries of cases published in the Lexis database.  He also identifies the issues discussed in cases so that they can be properly categorized for more efficient search in the Lexis database.  Additionally, Debtor reviews and edits case summaries submitted by other attorneys.  These functions are all carried out from home using company software.  *Id*.  Debtor has received high praise from his superiors, even winning an award for employee of the year in 2003 in his 500-person department.  (Appellant's Br. 6.)  Debtor has applied for permanent positions with Lexis, but he has no guarantee of continued employment.  Mem. Op. 7.

Beginning in October of 2001, Debtor began making $50 monthly payments on his outstanding student loans.  *Id*. at 7.  At various times, Debtor made efforts to renegotiate his debts but was rebuffed each time.  One example of Debtor's negotiation attempts took place shortly after he began working at Lexis.  On August 9, 2001, Debtor sent a letter to TERI indicating that he would like to negotiate new terms in lieu of seeking a discharge under the

bankruptcy laws. The idea of a discharge in bankruptcy was generated out of Debtor's research on means of escaping the pressure created by his debts. (Trial Tr. 141-42.)

Debtor current salary is $46,000. Mem. Op. at 6. Debtor's current net monthly income, including child support from Debtor's ex-wife, is $3,574.56. The bankruptcy court found Debtor's current reasonably necessary expenses to be $3,259 before loan payments. *Id*. at 8. Appellants challenge several of Debtor's expenses as not reasonably necessary, including monthly contributions of $220.56 to Debtor's 401(k) account, $650 per month for food, and $114 for telephone service. As mentioned at the outset, Debtor owes approximately $235,000 in student loans and interest. *Id*. at 13.

## II.  LEGAL STANDARD

This court has jurisdiction to hear appeals from "final judgments, orders, and decrees" of a bankruptcy court. 28 U.S.C. § 158(a)(1) (2006). The court reviews legal conclusions of the bankruptcy court *de novo*. *United States Dep't. of Educ. v. Gerhardt (In re Gerhardt)*, 348 F.3d 89, 91 (5th Cir. 2003). The findings of fact made by the bankruptcy court will not be disturbed unless found by the district court to be clearly erroneous. FED. R. BANK. P. 8013. A decision to discharge student loan debts under 11 U.S.C. § 727 (2006) is reviewed *de novo*. *In re Gerhardt*, 348 F.3d at 91.

## III.  DISCUSSION AND ANALYSIS

Debtor seeks to have the outstanding debt cancelled under 11 U.S.C. § 727 which allows certain debts to be discharged in bankruptcy. Among the debts to which Section 727 is inapplicable are those enumerated in Section 523. 11 U.S.C. § 727(b) (2006). Section 523(a)(8) provides that a debt arising out of education loans may not be discharged unless failure to do so

would create an "undue hardship" on the debtor. 11 U.S.C. § 523(a)(8) (2006). While "undue hardship" has never been given a precise definition, the Fifth Circuit Court of Appeals evaluates whether an undue hardship exists under the three-factor analysis first enumerated by the Second Circuit Court of Appeals. *In re Gerhardt*, 348 F.3d at 91. Under the analysis, an undue hardship does not exist, and consequently a discharge cannot be obtained, unless the debtor can show

> (1) that the debtor cannot maintain, based on current income and expenses, a 'minimal' standard of living for [him]self and [his] dependents if forced to repay the loans;
> (2) that additional circumstances exist indicating that this state of affairs is likely to persist for a significant portion of the repayment period of the student loans; and
> (3) that the debtor has made good faith efforts to repay the loans.

*Id*. (quoting *Brunner v. New York State Higher Educ. Servs. Corp.*, 831 F.2d 395, 296 (2nd Cir. 1987)). Debtor is unable to establish the third factor of the inquiry. As such, the bankruptcy court's partial discharge of the loan debt was in error. This court, however, is not inclined to disturb the bankruptcy court's analysis of the other two factors.

In order to establish that he has made a good faith effort to repay his loans, Debtor must demonstrate that he has made "efforts to obtain employment, maximize income, and minimize expenses." *Educ. Credit Mgmt. Corp. v. Frushour (In re Frushour)*, 433 F.3d 393, 402 (4th Cir. 2005) (quoting *In re O'Hearn*, 339 F.3d 559, 564 (7th Cir. 2003)). These factors, once demonstrated, help to establish that the debtor's problems are crafted by forces outside of his control. *In re Frushour*, 433 F.3d at 402. The debtor's efforts to seek out mechanisms to reduce the onerous burden of his debts, such as loan consolidations, are illustrative, though not dispositive, on the issue of good faith. *Id*.; *Educ. Credit Mgmt. Corp v. Pratt (In re Pratt)*, 2007 U.S. Dist. LEXIS 21735 *21 (S.D. Tex. 2007).

Debtor has failed to minimize his expenses. Debtor's monthly 401(k) contribution of $220 is incompatible with the undue hardship standard Congress chose to apply to discharges of student loans. In *In re Speer*, the court faced a similar issue. In that case, the debtor was a thirty-four year old male with a thirteen year old daughter. *Speer v. Educ. Credit Mgmt. Corp. (In re Speer)*, 272 B.R. 186, 188-89 (Bankr. W.D. Tex. 2001). Among the debtor's expenses was a $140 monthly contribution to a retirement plan. *Id*. at 194. The court concluded that repayment of student loans "would certainly take priority over saving for retirement under a standard of undue hardship." *Id*. (internal quotation marks omitted); *see also, e.g.*, *Pobiner v. Educ. Credit Mgmt. Corp. (In re Pobiner)*, 309 B.R. 405, 417 (Bankr. S.D.N.Y. 2004) (characterizing monthly 401(k) contributions as among the debtor's "luxuries"). While saving money for one's retirement is certainly wise, Congress, through its demanding standard, has chosen to give priority to the repayment of student loan debts.

Debtor also has failed to minimize his expenditures with regard to food. Debtor spends approximately $650 each month on food for his son and himself. Contributing to Debtor's food expenses is his penchant for eating out. Among the restaurants Debtor frequented were Pei Wei, California Pizza Kitchen, Chipotle Mexican Grill, and Luna de Noche. While Debtor characterized such outings as less expensive than preparing one's own meals, common experience dictates otherwise. In *In re Salyer*, the court examined the Salyers' monthly food expenses. *Salyer v. Sallie Mae Serv'g. Corp. (In re Salyer)*, 348 B.R. 66, 71 (Bankr. M.D. La. 2006). The court described outings at McDonald's, Subway, Sonic, and Burger King as among the debtors' "significant discretionary expenditures." *Id*. Many of the restaurants chosen by the instant debtor are generally more expensive than those in *Salyer*. As such, Debtor's monthly

food expenses indicate a failure to minimize expenses consistent with a showing of good faith under the *Brunner* analysis.

Appellants vigorously argue that Debtor has failed to maximize his income because he has yet to obtain his law license in the State of Texas. They argue that his law license will make him more marketable. Appellants, in this vein, argue that Debtor should expect to earn $117,000 per year, the median salary for a Texas attorney in 2005. Appellants' dollar figure, however, may be a little too optimistic and may overlook the realities of the legal hiring marketplace. Debtor's experience in the legal field is minimal. He worked for two years at a law firm in Pennsylvania that primarily serviced a single client. He also attempted to open his own practice, but was unable to devote the necessary effort to its success because of his divorce proceedings. Since then, he has worked for several years for Lexis summarizing cases. While he has always received high praise for his work at Lexis, the experience gained there does not translate neatly into the practice of law. He has never had to advocate a position, distinguish cases, draft legally-binding documents, develop and retain clients, or negotiate on behalf of a client while employed at Lexis. Debtor is over a decade removed from law school, and his grades were insufficient to secure well-paid employment then. It strains the court to conclude in any way other than that Debtor faces difficult prospects in the highly competitive legal job market. Nevertheless, securing his license to practice law in the State of Texas should assist the Debtor in maximizing his income. While the Debtor has demonstrated a willingness to find the best possible work since graduating from law school, a lawyer without a law license, in all likelihood, will not be able to maximize his income as long as he remains in the legal field. The court finds, therefore, that Debtor has not maximized his income.

Debtor has shown mixed levels of enthusiasm regarding the payment of his loans. Debtor made payments while employed in Pennsylvania. Debtor also made voluntary payments of $50 a month from October of 2001 until April of 2004. In addition, Debtor approached his creditors on several occasions, offering to renegotiate the terms of the loans. Debtor also consolidated his loans and sought forbearances and deferments.

However, Debtor's offers of repayment were not made in good faith. Appellants state that each of the offers to renegotiate included repayment of principal only, payment of ten per cent of Debtor's income determined by Debtor to be disposable, and that the lenders withdraw negative remarks on Debtor's credit reports. Debtor has not disputed these contentions, and the court finds therefore that the offers made by Debtor were not made in good faith.

Moreover, Debtor began researching bankruptcy discharge of his debts as early as August of 2001, but apparently never researched federal programs designed to help those in positions similar to Debtor. (Trial Tr. 142.) His posture, therefore, was not of a debtor acting in good faith to repay the money he borrowed. Rather, Debtor took the stance that a bankruptcy discharge was preferable to repayment. Even cursory research on the issue would have provided Debtor with information on the William D. Ford Direct Loan Program. A widely known federal program, its contours are outlined in the Code of Federal Regulations, and it allows troubled debtors to repay as much of their student loans as their income allows. *See generally* 34 C.F.R. § 685.100, *et. seq.* (2006). While Debtor certainly was entitled to pursue a discharge in bankruptcy, his reticence to consider other options indicates a lack of good faith.

Additionally, as Debtor's annual salary at Lexis increased from $30,000 to $46,000, Debtor continued to make the same $50 monthly payments. That Debtor did not increase his

payments is further evidence of his lack of earnestness in reimbursing his lenders. When considering these facts alongside Debtor's failure to maximize his income and minimize his expenses, the court is compelled to conclude that Debtor has failed to establish the third element of the *Brunner* analysis. As such, the bankruptcy court's conclusion that repayment of his student loans would constitute an undue hardship was in error.

The final issue for discussion is that of the bankruptcy court's exercise of its equitable powers under 11 U.S.C. § 105(a). The bankruptcy court found Debtor to have established the three prongs of *Brunner* and then granted a partial discharge of the debts under Section 105(a). While the court agrees that a proper finding of undue hardship would allow the bankruptcy court to exercise its powers of equity, this court's finding that Debtor failed to establish all three *Brunner* factors necessitates a brief comment as to such application.

Though the Fifth Circuit Court of Appeals has not weighed in on the issue, the other circuit courts that have done so have all agreed that a finding of undue hardship necessarily precedes the bankruptcy court's exercise of its equitable powers. *Saxman v. Educ. Credit Mgmt. Corp. (In re Saxman)*, 325 F.3d 1168, 1175 (9th Cir. 2003); *Hemar Ins. Corp. of America v. Cox (In re Cox)*, 338 F.3d 1238, 1243 (11th Cir. 2003); *Miller v. Pa. Higher Educ. Assistance Agency (In re miller)*, 377 F.3d 616, 623 (6th Cir. 2004); *Aldrete v. Educ. Credit Mgmt. Corp. (In re Aldrete)*, 412 F.3d 1200, 1207 (10th Cir. 2005). While the bankruptcy court has broad equitable powers, it must exercise those powers "only within the confines of the Bankruptcy Code." *Southmark Corp. v. Grosz (In re Grosz)*, 49 F.3d 1111, 1116 (5th Cir. 1995). Allowing a partial discharge in the absence of a finding of undue hardship pursuant to Section 523(a)(8) would be contrary to that tenet. As the Ninth Circuit Court of Appeals stated in *In re Saxman*, allowing a

partial discharge without first finding the debt to have created an undue hardship "ha[s] the very real potential to eviscerate the statutorily-based undue hard-ship provision." *In re Saxman*, 325 F.3d at 1174. Expansion of the rights of a debtor to have his student loan debts discharged in bankruptcy is a matter better left to Congress than to the equity of the courts. *See In re Cox*, 338 F.3d at 1243.

### IV.  CONCLUSION

Debtor has failed to establish an undue hardship as that standard has been interpreted by the Fifth Circuit Court of Appeals. *In re Gerhardt*, 348 F.3d at 91. As such, the discharge of his student loan debts, whether in whole or in part, was improper. The bankruptcy court's ruling that Debtor satisfied the third prong of the *Brunner* test is REVERSED, and the matter is hereby REMANDED to the bankruptcy court for proceedings consistent with this opinion.

   IT IS SO ORDERED.

**SIGNED this the 28th day of September, 2007.**

*/s/ Richard A. Schell*
RICHARD A. SCHELL
UNITED STATES DISTRICT JUDGE